NEW YORK, P. & O. R. CO. v. NEW YORK, L. E. & W. R. CO. et al.

(Circuit Court, N. D. Ohio, E. D. October 21, 1893.)

1. RAILROAD COMPANIES—RECEIVERS—LEASED LINES—ABROGATION OF LEASE.
   The receivers of a railroad company have no power to abrogate a valid lease of railroad property, made to it by another company; and, as between lessor and lessee, the lease must stand until abrogated under some of the conditions contained therein.

**2. SAME—ADOPTION OF LEASE.**

The mere appointment of receivers for a railroad system, and their taking possession of a leased road, does not, even if the bill shows that receivership was brought about for the purpose of preventing a disintegration of the system, render them assignees of the lease, or require their adoption thereof, so as to make the rental a preferred claim which they are bound to discharge; nor does the fact that they continued to operate the leased line for some time work an adoption of the lease when the lessor has never demanded a surrender of its road, although entitled to do so because of breach of condition by nonpayment of rent.[1]

**3. SAME—RENTALS ACCRUING PRIOR TO RECEIVERSHIP—PRIORITIES.**

Rental accruing under a railroad lease prior to the appointment of receivers for the lessee is an unsecured liability entitled to no priority.

**4. SAME—CHARACTER OF LEASE.**

It is immaterial in such case that the lease provides that when the annual gross earnings of the demised road are less than or equal to a fixed sum, the lessee shall retain a certain percentage thereof, and pay over the remainder to the lessor, for this merely measures the rental by the earnings, and the lessor has no right to any specific money.

**5. SAME—EXTENSION OF RECEIVERSHIP—ANCILLARY AND INDEPENDENT SUITS —COMITY.**

Where a railroad receivership has been extended by ancillary appointment over the property of the company in another jurisdiction, the court in the latter jurisdiction will not, even if it has the power, extend the receivership to, or appoint additional receivers in, another independent and original suit, brought by a corporation which has leased its road to the insolvent company, upon unsupported allegations that the original receivership was brought about by fraud and collusion, and that the receivers are hostile to the lease; for the rule of comity, as well as the interests of all concerned, require that the road should be operated under one management, and as an entirety.

In Equity. Bill by the New York, Pennsylvania & Ohio Railroad Company against the New York, Lake Erie & Western Railroad Company and John King and John G. McCullough, receivers. Heard on rule to show cause, etc. Rule discharged.

Statement by LURTON, Circuit Judge:

This cause came on to be heard at a term of the United States circuit court for the northern district of Ohio, held at Cleveland, October 9, 1893, when, after argument by counsel for complainant and for the defendants, it was ordered that the defendants appear and show cause at chambers in the city of Cincinnati, on the 14th October, 1893:

"(1) Why it should not be adjudged and decreed that the said indenture of lease has not been abrogated or annulled, but continues to exist, and that all the provisions and covenants therein contained have continued and still continue to be obligatory upon the defendant company, its property and franchises, now in possession of this and other courts, in the suit and suits of the said Park, and in which receivers have been appointed.

"(2) Why it should not be ordered that the receivership aforesaid of the property and franchises of the defendant company granted and established by this court in the said suit of the said Trenor Luther Park be granted, extended, and established in this suit, and that a suitable person or suitable persons may be appointed receivers of the said property and franchises in this suit.

"(3) Why it should not be ordered and decreed therein that the receivers so appointed do continue to operate the complainant's said leased lines of railroad and property in all respects according to the terms and provisions of the said lease, and perform all the covenants therein contained and speci-

[1] Compare Farmers' Loan & Trust Co. v. Northern Pac. R. Co., 58 Fed. Rep. 257.

fied to be performed by the defendant company; and that the said receivers keep a separate account of all the earnings of the said leased railroads and property, and file such accounts in this court at the end of each month, and the said receivers pay the rent accruing under the said lease when and as it becomes due and payable according to the terms thereof."

Upon the argument of this rule to show cause the original bill and exhibits of the complainant, filed October 8, 1893, and certain affidavits in support of its allegations of fact, were read in behalf of the complainant. In answer to the rule the defendants read the original bill of Trenor Luther Park, filed in the circuit court of the United States for the southern district of New York, and now there pending against the defendant corporation the New York, Lake Erie & Western Railroad Company, and the answer of said corporation to said bill, and the decree appointing the defendants King and McCullough receivers for the property and franchises of said corporation. There was also read the intervening petition of the complainant corporation, filed in that cause, praying for a direction to the said receivers to pay to the complainant company the past-due rents, and the rents which should accrue thereafter under a certain lease for 99 years of the railroad owned or leased by the complainant corporation to the New York, Lake Erie & Western Railroad Company; also the decree of the said court on said petition refusing the relief asked. There were also read certain affidavits controverting many of the allegations of fact contained in the bill of complaint touching breaches of the covenant in said lease concerning the preservation of the property of the lessor company by the lessee company during the continuance of the lease.

From the pleadings in the general cause mentioned and the decrees thereon, and from the affidavits thus submitted, the following facts appeared:

First. That the defendant corporation is a New York corporation, owning a line of railroad extending from Jersey City, in the state of New Jersey, to Salamanca, in the state of New York, with certain branches to Dunkirk and Buffalo. That it also operated under contracts or leases various other lines extending to the coal fields of Pennsylvania; and that it held, controlled, and operated, under a lease for 99 years, the entire line of railroad owned by the complainant company, a corporation of the state of Ohio, extending from Salamanca, in the state of New York, to Marion and Dayton, in the state of Ohio, together with certain other lines in the state of Ohio, leased by the corporations owning them to the complainant corporation. This lease by the Ohio corporation to the New York corporation was made in 1883, and was for a period of 99 years, subject to an annual rental, and subject to forfeiture upon failure to pay the stipulated rents, or upon breach of certain covenants concerning the maintenance and operation of the leased lines.

Second. In July, 1893, one Trenor Luther Park, a citizen of the state of Vermont, filed his original bill in the circuit court of the United States for the southern district of New York, "in behalf of himself and all other creditors who should join in the prosecution of his suit," and who were creditors, with or without security, of the New York, Lake Erie & Western Railroad Company, alleging that he was a creditor of said company, as follows:

(1) Three of said first consolidated mortgage bonds of the par value of $1,000 each, interest upon which will become due September 1, 1893.

(2) One hundred of said second consolidated mortgage bonds of the par value of $1,000 each, interest upon which will become due December 1, 1893.

(3) One hundred of the funded coupon 5 per cent. bonds of 1885 of the par value of $1,000 each, interest upon which will become due December 1, 1893.

(4) The promissory note of said corporation, made December 1, 1892, for $34,000, payable on demand, bearing interest at the rate of 6 per cent. per annum, payment of which note has been demanded and wholly refused, and the same is now wholly due and unpaid.

And that complainant further alleged that the sum of $34,000 for which the note last mentioned was executed and delivered was advanced by him to the said corporation on December 1, 1892, and that the said amount, with other amounts advanced by others at or about the same time, were specially

advanced as an emergency fund to meet the immediate and pressing necessities of the said corporation, with the understanding and agreement by said corporation that the said advances should be repaid within a short time thereafter out of the earning and income of said corporation in preference to all other claims whatsoever, and that the said earning and income were and are in effect pledged for the security of such special advances; that the said corporation has not paid any part of said advances, and that it is unable to do so, but that there has been a large amount of net earnings realized, which should have been used to pay said special advances, but the same have been used by the said corporation for other purposes; "that accordingly the condition of the agreement and pledge upon which said advance was made has been broken, and remains in default, and that the complainant and others who made similar advances are entitled to a lien upon the earnings and income of the said corporation for the amount thereof."

Said bill so filed by said Park also alleged that the property of the said corporation was subject to a number of mortgages securing several series of negotiable bonds. That, in addition to its bonded debt, a large floating or unsecured debt, aggregating upwards of $5,000,000, had been created, and that many creditors of this class were pressing for immediate payment, and about to bring suit therefor, and levy attachments on the rolling stock, material, and supplies and other property of the said corporation on hand and kept by the said corporation for necessary use in operating its railroad. Among other facts stated in order to secure a receiver and procure the administration of the property of the said company by a court of equity for the benefit of all its creditors, were these:

"That the only means whereby the said New York, Lake Erie & Western Railroad Company can pay the interest upon its mortgage bonds, including that due upon the bonds held by the complainant, or can pay its floating debts and discharge its current obligations, is by the continued maintenance and operation of its railroad system, and by the friendly interchange of business with all connecting roads, and by the prompt collection of the revenues accruing from time to time by the operation of said railroad, and by the uninterrupted use of all its railroads, rolling stock, and property whatsoever; and that any suits or attachments levied upon such revenues and property would seriously embarrass and cripple it, and diminish, if not destroy, its power successfully to operate the said road in the exercise of its railroad franchises.

"That the said New York, Lake Erie & Western Railroad Company is engaged in operating a certain railroad running from Salamanca, in the state of New York, to Marion and Dayton, in the state of Ohio, and forming an important part of its main line, by virtue of a certain lease heretofore executed between the New York, Pennsylvania & Ohio Railroad Company and the said New York, Lake Erie & Western Railroad Company, to which, and the amendments thereof, begs leave to refer for the particulars thereof. That, in order to maintain its rights under the lease, and to continue the use and enjoyment of the said leasehold property, it will be necessary, under the terms of the said lease, for the New York, Lake Erie & Western Railroad Company to make a payment of $240,000, due to the said New York, Pennsylvania & Ohio Railroad Company on the 31st day of August, 1893, and that, unless the said payment is promptly made, it will be a cause of forfeiture of the said lease, whereby the said lessor company can terminate the same, and that the forfeiture of the said lease would be an irreparable injury to the said New York, Lake Erie & Western Railroad Company, and to the complainant as a creditor thereof.

"That the said New York, Lake Erie & Western Railroad Company is engaged in operating certain other railroads in the said states, which form important parts of its general system of railroad, and are essential to the successful operation of its main line, and that under said leases it is required from time to time to make payments of the amounts of rentals provided for thereby, in order to maintain its rights thereunder, and to continue the use and enjoyment of the said leasehold property; and that, unless the said corporation is protected from the floating debt which is now pressing, it will be unable to pay the amounts of rentals provided for by the said leases,

and will be in great danger of forfeiting its rights thereunder, and that the forfeiture of the said leases would be an irreparable injury to the said New York, Lake Erie & Western Railroad Company, and to the complainant as a a creditor thereof."

The bill concluded with the following prayer for equitable relief:

"That the rights of the complainant and of the other creditors of the defendant, including all holders of its first and second consolidated mortgage bonds, in or to the property, real or personal, of the said railroad company, may be ascertained and protected, and that the court will fully administer the fund in which complainant is interested, constituting the entire railroad and assets of said corporation, and will for such purpose marshal all its assets, and ascertain the several and respective liens and priorities existing upon each and every part of the said system of railways, and the amounts due upon each and every of such mortgages or other liens, and enforce and decree the rights, liens, and equities of each and all of the creditors of said New York, Lake Erie and Western Railroad Company as the same may be finally ascertained and decreed by the court upon respective interventions or applications of each or every such creditor or lienor in and to not only said lines of said railroad, its appurtenances and equipments, but also to and upon each and every portion of the assets and property of the said corporation.

"That for the purpose of preserving the unity of said system as it has been for many years maintained and operated, and preventing the disruption thereof by separate executions, attachments, or sequestrations, the occurrence of which will be inevitable in view of the unavoidable defaults in payments of interest and other obligations which will presently occur, a receiver or receivers be appointed of the New York, Lake Erie and Western Railroad Company, and all and singular the railroads, rolling stock, franchises, rights, and property, real and personal, belonging to said company, with full power and authority to demand, sue for, collect, receive, and take into his or their possession the goods, chattels, rights, credits, moneys, and effects, lands, tenements, books, papers, and property of every description belonging to the said company, and with all the incidental powers ordinarily vested in receivers in like cases, and with full power and authority to run and operate the said railroads, mines, estates, and property owned or controlled by the said company, or in which the said company has any right or interest, and to collect and receive all the rents, issues, profits, and incomes thereof, and to apply the said income and receipts thereof under the decree of the court until such time as the trustee under the first or second consolidated mortgage shall come into possession of the said property, or for such period as the court shall order, to protect and preserve the corporate franchises, privileges, and property, and to preserve the corporate existence of the said company, and to protect and preserve the said railroads, mines, estates, and property, real and personal, from being sacrificed under any proceedings which can or may be taken and likely to prejudice or sacrifice the same."

The New York, Lake Erie & Western Railroad Company at once answered the said bill, and admitted all of its allegations, and joined in the prayer for the appointment of receivers.

Upon the filing of this bill and the answer of the corporation, the defendant King, who was at the time president of the said corporation, and McCullough, its vice president, were appointed and duly qualified as receivers of the property and franchises of the said debtor company. Bills of like character were subsequently filed in the courts of the United States for the several jurisdictions within which the line of said road extended, including the northern district of Ohio, within which was situated the leasehold interest of the New York, Lake Erie & Western Railroad Company in the line of road owned or leased by the New York, Pennsylvania & Ohio Railroad Company; and in those several jurisdictions a like order was made, appointing King and McCullough receivers for the property of said corporation within such jurisdiction. Under these several appointments said receivers have since July 25, 1893, been in entire and exclusive possession of the entire system of roads owned or leased by the New York, Lake Erie & Western Railroad Company, including the lines owned or leased by the New

York, Pennsylvania & Ohio Railroad Company, and included in the lease of 1883, as before stated.

Third. After the proceedings above stated, the complainant, the New York, Pennsylvania & Ohio Railroad Company, filed its petition in the suit of Park v. The New York, Lake Erie & Western Railroad Company, pending in the southern district of the state of New York, setting out the lease under which its road was controlled and operated by the said New York corporation, and praying that the receivers be directed to pay certain arrearages of rent alleged to have existed at date of the receivership, and that they be required to pay future rents as they should accrue, and in accordance with the stipulations of the lease. The receivers answered the petition, and insisted, among other things:

(1) That the contract between the New York, Pennsylvania & Ohio Railroad Company and the New York, Lake Erie & Western Railroad Company was not in fact a lease for a fixed stipulated rent, "but was in legal effect a contract between the two roads for the joint operation of their roads as one line for their mutual benefit, and upon a just division of profits."

(2) That the lessor company had received out of the joint earnings of the line about $1,400 more than the actual earnings of the leased line.

(3) That the petitioner has never claimed from them as receivers, nor does it now claim in its petition, the repossession of its railroad, or the dissolution of the arrangement between them.

(4) That the receivers were not assignees of the so-called "lease," "have never assumed or been authorized to assume its obligations, but are in possession of the whole line as receivers only, and as a part of the receivership property placed in their hands to be operated and managed under the order of the court for the just and equal benefit of all parties concerned as their respective rights and priorities may be hereafter determined; and they desire only in the matter of said petition to execute such orders as the court may think proper to make upon full knowledge and consideration of the material facts and existing equities."

(5) That, in view of the many interests involved, and the insolvency of the Erie Company, and the insufficiency of the assets to pay all the just demands maturing, they ought not "to be required to pay the petitioner any more than the actual net earnings of that portion of the line in their possession which is the property of the petitioner." That any payment in excess of such earnings would necessarily come out of the earnings of other portions of the insolvent system, "and therefore directly out of the pockets of other just creditors who must, to that extent, remain unpaid." That in the judgment of the receivers they could not, in justice "to the lessors of other portions of its line which are operated at a profit, take the earnings which result from the operation of such portions to pay to the petitioner a surplus in excess of the earnings of its property, and if they do so it will result in leaving the receivers without funds to pay the rentals and interest due such other lessors and creditors."

(6) The receivers firmly insist that they were not bound to pay any sums accruing to the petitioner under the terms of the lease prior to their appointment as such receivers, "but the same constitutes a debt against the Erie Company, subject to such future adjustment as may be found equitable," and that since their appointment they had already paid as much as the net earnings of the petitioner's road amounted to, and that "they believe they will be able to continue to make such payments with reasonable promptness and in such way as to enable the petitioner to meet its necessary payments and obligations as they accrue."

This answer was supported by certain affidavits. Upon the hearing it was ordered that the prayers of the petition be refused and denied.

Upon this result being announced, the present bill was filed. Its allegations, so far as necessary to be stated are substantially these:

That the filing of the bill by Park was collusive, he having been procured to do so for the purpose of preventing the creditors of said Erie road from resorting to their usual and appropriate legal remedies. That no default had been made in the payment of the interest upon any of the bonds held by him, and that as a holder of such bonds he was not entitled to seek any

relief whatever. That as an unsecured creditor by promissory note for $34,000 he was not entitled to represent any other creditors than himself. That the receivers appointed were the executive officers of the Erie Company, and that their appointment was wrongful and collusive. That they are the same officers who had "violated and disregarded the covenants of the lease, * * * the same persons who have committed and permitted the great waste and spoliation of the complainant's leased property hereinbefore described, and the same persons who now, in their character as receivers, repudiate the lease altogether, insisting that the indenture aforesaid is not a lease, and refuse to pay the rents and perform the covenants of the indenture."

The bill continues as follows:

(1) "These so-called 'receivers,' in their actions, intentions, and purposes, are still in effect merely the executive officers of the defendant company, still continuing their hostile and wrongful course of conduct in respect to the said lease and the complainant's railroads and interests, but under the name of receivers claiming that this title and office gives them license to repudiate the lease openly, whereas, before, they were obliged to do so covertly. The facts being as above set forth, it is necessary, in order to maintain and preserve what remains of the complainant's railroads and their appurtenances, and to protect their large interest therein, both public and private, that the complainant should have redress for the violations and breaches of the said lease already committed, and protection against further acts of the same character; that the covenants of the lease should in the future be strictly enforced and performed; that the rent already due should be paid, and that payment should be made hereafter promptly as rent becomes due by the provisions of the lease. To insure these just and equitable ends and objects, it is, for the reasons above stated, necessary that the said receivers, King and McCullough, should be removed, and other impartial persons appointed in their places, or that some other person or persons not hostile to the plaintiff's rights and interests as above set forth should be associated with them; and further that the said receivership be extended to and established in this suit as hereafter prayed for in order that the fund now in the possession of this court in the suit of the said Park, consisting of all the property and franchises of the defendant company, may be made responsible and answerable for the performance of all the obligations of the said lease; otherwise the complainant will suffer, and all the interests, both public and private, involved in its property and franchises, will suffer irreparable loss, injury, and damage."

(2) That neither Park nor the receivers appointed under his bill, and at his procurement, should be permitted to repudiate the obligations of the lease concerning the payment of rentals out of any fund in the receivers' hands in view of the thirteenth paragraph of his bill, heretofore quoted. "That the rights of the complainant under the said lease have not and could not be destroyed, impaired, or in any manner affected by any proceedings on the part of the said plaintiff in collusion with the defendant company or otherwise. But nevertheless, as hereinbefore mentioned, and as will hereafter more fully appear, one of the main objects sought to be accomplished indirectly and fraudulently by means of the said suit, was and is the abrogation of the lease, and the destruction of the plaintiff's rights thereunder by judicial assistance obtained by fraudulent and collusive contrivances and devices."

(3) That the covenants concerning the maintenance of the roadway, station houses, rolling stock, engines, and tools, in quality and quantity up to the standard and condition in which they were when the lease took effect had been breached, and that great dilapidation had been suffered, the property being in such condition that large sums of money would be necessary to put it in the condition, as to quantity and quality, as when leased.

(4) That prior to the receivership rents had accrued under the lease aggregating some $307,250; that upon application of the Erie Company an extension had been granted, and acceptances payable October 16 and November 16, 1893, taken, which had been indorsed and negotiated by the Ohio Company to meet its own fixed obligations; that since that time rents had accrued aggregating, after deducting certain payments and offsets, the sum of $216,256.25, which was now due and unpaid.

(5) The provisions of the lease concerning the payment of rentals were substantially as follows:

"As rental for the said demised premises the Erie Company agrees that whenever the annual gross earnings of the demised premises, ascertained as herein provided, are less than or equal to six million of dollars, ($6,000,000,) the Erie Company shall retain sixty-eight (68) per centum thereof, and pay to the Ohio Company the remaining thirty-two (32) per centum thereof."

"If under the provisions of this lease the total rental due the Ohio Company as aforesaid shall for any year amount to less than the sum of one million seven hundred and fifty-seven thousand and fifty-four dollars and eighty-nine cents, ($1,757,054.89,) (the said sum being the amount of the ascertained actual net income of the property hereby demised for the twelve months ending the 31st of December, 1882, being the last fiscal year of the Ohio Company, as ascertained and certified by the auditors, respectively, of the parties hereto, as will appear by their audit attached hereto, and made part of this indenture,) the difference and deficiency shall be made up and paid by the Erie Company, and the sum so paid to make up such deficiency shall be retained by the Erie Company out of subsequent annual earnings which may be in excess of the minimum sum last above specified."

"In order to enable the Ohio Company to meet its obligations the Erie Company will make payments of said rental as follows, that is to say: On the tenth day of August, eighteen hundred and eighty-three, there shall be paid the sum of one hundred and twenty thousand dollars, and thereafter periodically, commencing on the tenth day of February, 1884, there shall be paid half-yearly,—that is to say, on each fifteenth day of February and each fifteenth day of August,—to the order of the treasurer of the Ohio Company, the sum of two hundred and forty thousand dollars, and, in addition thereto, there shall be paid on the first of each month in every year the sum of one hundred thousand dollars, beginning on the first of July, eighteen hundred and eighty-seven."

There were certain other provisions providing for deductions in certain contingencies and for an increase in certain others, unnecessary to be fully set out.

(6) The bill "further provides that while the said lease continues and remains in force the entire amount of gross earnings of the leased premises constitutes as against the defendant company, and those claiming under it, a fund which, raised and produced by the performance by the defendant company of all of the covenants of the lease, must in justice and equity be first applied, so far as necessary, to satisfying all the requirements of the lease, and that it is only in the surplus, if any, that may remain after such application, that the defendant company or any of its creditors have any right, title, or interest; that, in effect, the complainant has an equitable lien upon such earnings, which in equity entitles the complainant to such application thereof. The complainant avers that it is an inequitable and unlawful diversion of such earnings to apply the same, or any part thereof, to the defendant company's own use and general purposes, either by that company or its receivers, while the requirements of the lease remain unfulfilled and unperformed, and that to the extent that such diversion has already taken place the amount thereof should be replaced out of the fund consisting of the defendant company's property and franchises now in this court."

The defendants King and McCullough filed their joint affidavit denying all fraud and collusion in the filing of the bill by Park, or in their appointment as receivers, and denied any purpose hostile to the lease or to the interest of the complainant company. They deny that they represent any particular interest, but insist that they are the mere custodians of the property under order of the court in the interest of all concerned therein. They say that they have "never claimed the right to retain possession of complainant's road should it demand possession of it, but only that so long as they remained in possession by consent of complainant they should pay only what the property was worth, and not the amount called for by the terms of the contract with the Erie Company, * * *" and that since their appointment they had paid over the full amount of the net earnings of the complainant's said road, "except about seventy thousand dollars, which they are now prepared and willing to pay."

L. A. Russell, H. C. Ranney, Stevenson Burke, and W. W. MacFarland, for complainant.

Mr. Phelps, Wayne McVeagh, Williamson & Cushing, and Jennings & Russell, for defendants.

Before LURTON and TAFT, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge, (after stating the facts.) Complainant's bill must be treated as an independent original bill having as its object the appointment of receivers for so much of the property of the Erie road as consists of its leasehold estate in the roads owned or leased by the complainant corporation and to enforce the covenants and contracts of that lease against the Erie Company and its receivers. The fact that receivers have been heretofore appointed under another bill by a creditor of that company, filed primarily in the jurisdiction of the residence of that company, and under like bills filed by the same creditor in this and other jurisdictions, is recognized, and the difficulty met by asking that the receivership under the former bill be extended to this, and that other and additional receivers be appointed to act in conjunction with them, within this jurisdiction. To justify this independent proceeding many averments are made charging that the receivers heretofore appointed were the executive officers of the lessee company; that as such they are not impartial custodians, but hostile to the interests of the complainant, and inimical to the lease; that their appointment was secured by collusion between the Erie Company and Trenor Luther Park, the creditor whose name and debt was used to secure the receivership; that "one of the main objects sought to be accomplished indirectly and fraudulently by means of the said suit was and is the abrogation of the lease, and the destruction of the plaintiff's rights thereunder by judicial assistance obtained by fraudulent and collusive contrivances and devices."

The relief now asked under the rule to show cause is:

(1) The extension of the receivership of King and McCullough to this suit.

(2) The appointment of one or more additional receivers.

(3) A direction to the receivers to comply with the covenants and contracts of the lease by paying out of the gross earnings of complainant's road the rentals due and unpaid, and to pay in future the rentals as they shall accrue and be payable by the terms of the lease.

The averments of the bill that the appointment of the defendants King and McCullough was collusive; that the filing of the bill by Trenor Luther Park, and the appointment of the executive officers of the Erie Company as receivers, was part of a plan and purpose hostile to the complainant, and having as an end the destruction and abrogation of the lease, is a conclusion of law drawn by the pleader, and dependent upon the legal effect of the facts stated in the bill, and chiefly upon those concerning the conduct of the receivers in regard to this lease after their appointment.

As matter of law, the receivers could not abrogate a lease which was valid and binding between the Ohio corporation and its lessee, the New York corporation. Between lessor and lessee the lease must stand until it is abrogated by a resort to some one of the conditions contained therein. Whether or not the receivers have an option to adopt the lease, and make its terms and conditions obligatory upon them as receivers, and a charge upon the trust fund in their hands, presents quite another question. If they have this option, under direction of the court controlling their conduct, then their refusal to adopt the lease cannot tend to support the averment that their object is to abrogate it. If the interests of those concerned in the property of the Erie Company, considered as a trust fund in the custody of a court of equity for administration and ultimate distribution according to the rights and equities of each as fixed when the property was seized by the court, be that a forfeiture of this lease should be guarded against by preventing any default in rents, then the receivers should pay the rents and adopt the lease.

If, however, the receivers are unable to do this, looking to all the other burdens which rest upon them, and having regard to the best interests of the whole trust committed to their charge, then they should not adopt the lease, if they have such option. They should compare the advantages and disadvantages in the light of the whole situation, and as business men give their judgment to the court under whose direction they act. The interest of the lessor company is not, and should not be, a controlling factor in reaching a conclusion. They stand for and represent every interest. If complainant's interest demands that they shall adopt the lease, and the general interest of those interested as creditors is that it shall not be adopted, then the latter and wider interest should control. Whether they have an option in the matter will be considered further along, as well as the kindred question as to whether, by their possession, they have in fact elected to adopt the lease.

No case is made for the removal of the defendants as receivers, even if we were disposed to consider such an application before the court originally appointing them had been applied to. Neither does any sufficient reason now appear for extending their appointment to this bill, nor justifying this court in intruding other persons upon them as coreceivers of a part of the property committed to their management. Whatever rights the complainant has as a creditor or under the lease it can set up as against the receivers without any extension of the receivership. Such extension would complicate accounts, and result in conflicting directions. There are stronger reasons for the refusal to appoint additional receivers. The Erie system is a vast and extended one. Its lines extend into several states, and as many independent jurisdictions. The preservation of this system as a whole, its harmonious management as a unit, gives it its greatest value and power, and anything which tends to dismember it or to disrupt its management as an entirety should be avoided if possible. While it is a "system," and while it remains a great "trunk line," its management under order and direction of the court should be committed to one set of receivers having like

authority in each jurisdiction, and controlling each and every part of its property. Receivers are but officers and agents of the court. While necessarily much is committed to their judgment and discretion, yet their power depends upon the decrees and directions of the courts appointing them. Receiverships of railroad properties are in a large part peculiar appointments. Railroads, as public carriers, are charged with great public duties, and the public are interested that their operation shall be continuous. Creditors are likewise interested that there shall be no cessation in their maintenance as going concerns, because their value as property depends upon the active use of the line. These considerations have developed the present well-settled proposition that such receivers are the mere custodians of the property, and hold for and as mere agents of the court. Speaking of the character of such trustees, and the effect of such holding upon the interests procuring the appointment, Chief Justice Waite said:

"The possession taken by the receiver is only that of the court, whose officer he is, and adds nothing to the previously existing title of the mortgagees. He holds, pending the litigation, for the benefit of whomsoever in the end it shall be found to concern, and in the mean time the court proceeds to determine the rights of the parties upon the same principles it would if no change of possession had taken place." Fosdick v. Schall, 99 U. S. 251; Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. Rep. 787, et seq.

A receiver represents no particular interest or class of interests. He holds for the benefit of all who may ultimately show an interest in the property. He stands no more for the creditor than the owner. They are not assignees, and the principles of common law applicable to assignees do not define or determine the character of a receiver's possession or its effect upon the rights of those interested in the property in their possession. Receivers ought not to be appointed to represent the peculiar interests of one class, and, a fortiori, they should not be appointed to represent one interest out of a class of interests.

The receivers in this case are mere custodians of the property of the Erie Company. That company is a New York corporation. Its domicile was and is in the southern district of New York. That district was the appropriate district in which creditors should have instituted a proceeding looking to a receivership of all its property. Mr. Park's bill was properly filed in the district of the residence of the debtor corporation, and receivers were properly appointed by the jurisdiction of residence for the property within the jurisdiction. Inasmuch, however, as the line of road extended into other jurisdictions, it was necessary to the due administration of the property that similar proceedings should be had in each independent jurisdiction. That step was taken, and a like bill filed in this court, and the receivers who had been selected in the original jurisdiction appointed as receivers of the property within this jurisdiction. Two considerations demanded the appointment of the same persons: First, the interest of the owner and creditors of such a system of roads required unity in the custody and management; second, courtesy and comity between courts of equal

and co-ordinate jurisdiction required that a court of quasi ancillary jurisdiction should in such a matter conform, under ordinary circumstances, to the selection of receivers theretofore made by the court of primary jurisdiction. The appointment of different sets of receivers, in each separate jurisdiction would tend most manifestly to the disintegration of this railroad system. Its maintenance as a system, and its harmonious management as an entirety, are nowhere more clearly shown to be essential to the interest of all concerned, including the complainant, than by its own pleadings in this cause. We are not prepared to say that circumstances might not arise which would justify and demand independent action in the appointment of receivers by each court of independent jurisdiction, and even the removal of receivers once appointed. But the respect due by courts of co-ordinate power and jurisdiction to each other, and especially that due by a court whose jurisdiction in a large part is in some sense ancillary to the court of primary jurisdiction,—the court where the rights and equities of all must finally be aggregated, and the accounts of the receivership be adjusted,—demands that a strong case should be made before independent and divergent orders should be made tending to bring on conflict between courts endeavoring to administer the same property in such manner as will best subserve the interest of all interested in it. If we should appoint additional receivers, their jurisdiction would not extend beyond the borders of Ohio. They could not be placed in joint possession of even the whole of the complainant's road, for a part of its line is in the state of New York and another in the state of Pennsylvania. We could not hope that receivers intruded under such circumstances would be appointed by the court of primary jurisdiction. Such an appointment would be useless, vexatious, and injurious. It would lead to conflict in regard to management, and great complexity of accounts. There is every reason why it should not be done, and none why it should. The defendants, as receivers, have not, in our judgment, done or omitted to do anything which was not within the scope of their duty, and which has not been approved by the court originally appointing them. The charge that their appointment was part of a scheme hostile to the complainant company is not supported by the facts stated in complainant's bill, or any conduct of the receivers, and as a vague and general charge is highly improbable, and wholly and fully denied by the affidavits filed in opposition to this rule.

There is nothing in the opinion of Justice Harlan in Mercantile Trust Co. v. Kanawha & O. Ry. Co., 39 Fed. Rep. 337, which conflicts with the views here expressed. The bill of Park, filed in this court, was an original bill, properly framed to obtain the appointment of a receiver. The bill dismissed by Justice Harlan was not framed to obtain any original relief, and was only intended to obtain a ratification of what had been done and should be done under a bill pending in another jurisdiction. The power of this court under the bill filed by Park in this court is that of an independent court, authorized to deal with the property of

the Erie Company within its jurisdiction. What we have said as to primary and ancillary jurisdiction has reference not to the power and authority of this court under that bill, but as to the .manifest necessity of harmony in the administration of a line of railroad extending into several jurisdictions. This was fully recognized by the learned justice, who said:

"A good deal was said at the argument about the injury that might possibly ensue to mortgagors, mortgagees, creditors, and the public if an interstate railroad, covered by one mortgage, be placed under the management of different receivers, each acting under the orders of the court appointing him, and sold under separate decrees, rendered in distinct foreclosure suits brought in different circuit courts of the United States. Undoubtedly railroad property of that kind could be very materially injured in value, and the general public put to serious inconvenience, if the courts in which such separate suits are brought decline to act in harmony, or according to some fixed plan, in the administration and sale of the property. It is not, however, to be assumed that this court, if its jurisdiction is properly invoked in reference .to this railroad, so far as it lies in West Virginia, will fail in any duty imposed upon it by law, or the comity prevailing between courts of equal dignity and authority." 39 Fed. Rep. 340.

The view we have taken finds support in the following cognate cases: Wabash Ry. Co. v. Central Trust Co., 22 Fed. Rep. 272; Central Trust Co. v. Wabash Ry. Co., 25 Fed. Rep. 693; Reynolds v. Stockton, 140 U. S. 254, 11 Sup. Ct. Rep. 773.

2. What is the relation of the receivers of the Erie road towards the lease executed to the Erie Company? It has been very earnestly contended that the receivers, being in possession of the leased property, have adopted the lease, and that they are bound by all the covenants of the lease, and must pay rent according to its terms. This is a total misconception, as we have already indicated, of the relations of a receiver, in cases of this kind, towards the property of an insolvent railroad. Receivers are not assignees. They did not take the lease in question by assignment, and the effect of taking possession of a leasehold interest belonging to the company is totally unlike that resulting from one who takes a lease by assignment. They took possession by and under order of the court, and not by act of any party or under any assignment. Receivers are not bound to adopt a lease, and have the option, under the direction of the court, to do so or not. This is well settled. Fosdick v. Schall, 99 U. S. 251; Quincy, M. & P. R. Co. v. Humphreys, 145 U. S. 96, 12 Sup. Ct. Rep. 787; St. Joseph & St. L. R. Co. v. Humphreys, 145 U. S. 113, 12 Sup. Ct. Rep. 795. As we have already seen, it is not in the power of such receivers to annul or abrogate such a lease as between the lessor and lessee company. No such power has been claimed or pretended by the defendants King and McCullough. Their opinion as to whether it was a lease or not cuts no figure. Their attitude before the circuit court of New York, upon the petition of the complainant company for a direction requiring them to hold under the lease and comply with its stipulations, and their attitude here through counsel, and by their affidavit filed on this motion, has been consistent, and is one of distinct refusal to adopt the lease for the trust, and of readiness to return complainant's road to it upon de-

mand. Then and now they say that it is not to the interest of the trust that the lease should be adopted, but that they are able and willing to manage the road, and pay over all of its net earnings, so long as complainant is content to leave possession with them. Complainant's right to declare a forfeiture and recover possession is clear. If, however, it is content to receive the net earnings, and look to the Erie Company as an unsecured creditor for all rents due at inception of receivership, and all unpaid while in possession of the receivers, then it should not complain. This was the view taken by Judge Lacombe upon the former application of complainant, and meets our full approval. Its claim for rent accruing before the receivership, by the refusal of the receivers to adopt the lease, is not entitled to any priority. It is an unsecured liability, and must rank along with all other claims of the same class on final distribution of the assets of the lessor company. Huidekoper v. Locomotive Works, 99 U. S. 258; Fosdick v. Schall, Id. 235; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 470, 6 Sup. Ct. Rep. 809; Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. Rep. 824.

But the complainant insists that the case is taken out of the general rule under which receivers are not bound to adopt a lease, by reason of the character and objects of the bill under which the receivers were appointed. Its counsel have cited and relied upon Jones, Mortg. § 483; Brown v. Railroad Co., 35 Fed. Rep. 444. The case last cited is the case cited by Mr. Jones to support his view of this question. That case is clearly not in accord with the later decisions of the supreme court of the United States already cited. The doctrine laid down by Judge Gresham that receivers take as assignees when appointed to prevent the disintegration of a system of road partly consisting of leased lines, is not sustained by the cases we have cited. In the case of Central Trust Co. v. Wabash Ry. Co., Judge Woods states that a rehearing had been granted in that case. As to the doctrine of the Brown Case, he said:

"It is true that in Brown v. Railroad Co., 33 Fed. Rep. 444, it was held that these receivers, by taking possession of a leased line under the order of the court, 'became assignees of the lease, and, as such, liable for the rent,' but a rehearing has been granted in that case since the report of the master in this was filed, and, while the doctrine of it is, perhaps, the established rule of cases which involve only private rights, the reported decisions show that it has seldom, if ever, been deemed applicable to receivers of railroads who had taken possession of leased roads, or of leased rolling stock found in use upon or in connection with the main or trunk lines over which they were appointed; for the reason, I suppose, that the taking possession of the leased property ordinarily is not a purely voluntary act, amounting to an election on the part of the receiver or the court appointing him, but is compelled by that public policy which requires a railroad of established use to be kept in operation. Indeed, it is sometimes a physical necessity. In this case, for instance, an immediate separation of the leased lines from the Wabash roads proper, or from each other, for the purpose of surrendering any of them, with its rolling stock, to its owner, was manifestly impracticable, even if it appeared, as it does not, that the owner was ready and willing to resume possession and to discharge the duty to the public in keeping the road in operation." 46 Fed. Rep. 32.

The allegations relied upon from the Park bill as indicating the object of the bill as intended to preserve the unity of the system by preventing a forfeiture of the lease from complainant is not an estoppel. It is only one of many purposes stated in that bill as making a receivership necessary, and like statements are made as to all the leases held by the Erie Company. The bill was the usual creditors' bill, and the receivers were appointed for the general purpose of holding, managing, and preserving the property as far as possible for the best interest of all. The receivers, when appointed, deemed that the best interests of the trust did not require or justify an adoption of this lease. The court of primary jurisdiction has, upon full consideration of an application like the one now at bar, held that the lease had not been adopted, and refused to direct its adoption. Without considering the legal effect of that action as a bar, we have reached a like conclusion,—that the legal effect of the possession by the receivers up to this time has not operated as an adoption of this lease.

Complainant further contends that this contract of lease is peculiar, that under it a fixed per cent. of the gross earnings of its road belongs specifically to it, and the receivers are bound to account for that proportion. There is nothing in this contention. The rental is determined by the amount of gross earnings. These earnings belong to the lessee company. The complainant has no right to any specific dollar or part of a dollar. The rent is simply measured by the earnings. But, if it were otherwise, the receivers are no more bound by that provision of the lease than any other. They have not adopted the lease, and are only liable for what in equity and justice they should pay. The net earnings of complainant's road are its entire contribution to the fund in the receivers' hands. This they are willing to pay over. The circuit court of New York was unwilling to direct that any greater sum should be paid, and we are of like judgment.

The rule must be discharged.