AAMCO INDUSTRIES, INC., AND ANOTHER v. WILLIAM E. DeWOLF.

250 N. W. 2d 835.

January 27, 1977 — No. 46394.

*Andrew P. Engebretson,* for appellant.

*Maslon, Kaplan, Edelman, Borman, Brand & McNulty, John C. McNulty, Marcy S. Wallace, George J. Hayward,* and *R. Michael Kennedy, Jr.,* for respondents.

Heard before Kelly, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

William E. DeWolf operated an AAMCO transmission service facility franchise in Bloomington, Minnesota. The Consumer Division of the Minnesota Attorney General's office received numerous complaints about the operation of DeWolf's facility. The attorney general's office contacted the AAMCO national consumer affairs office. Through a cooperative investigation between AAMCO and the attorney general's office, evidence of serious consumer fraud was obtained. AAMCO terminated DeWolf's franchise immediately and brought action for declaratory and injunctive relief. The trial court granted the relief sought by AAMCO. We affirm.

AAMCO Transmissions, Inc., is a wholly owned subsidiary of AAMCO Industries, Inc., and is authorized to do business in Minnesota. Hereinafter, these parties will be referred to as "AAMCO." AAMCO is the owner of those registered United States trademarks incorporating the name "AAMCO." It operates a nationwide chain of franchises to provide automobile automatic transmission service. AAMCO has operated in Minne-

sota for many years. In 1967, as a result of numerous consumer complaints, AAMCO entered into a stipulation of settlement with the State of Minnesota which provided in part as to AAMCO and their franchisees as follows:

"a)   They shall not sell their remove, disassemble inspect and reassemble service when such service is not reasonably required, and such service shall not be sold until the customer's automobile, if operable, has been road tested.

"b)   They shall not without express authorization remove and disassemble the transmission from a prospective customer's automobile; nor shall they remove and disassemble the transmission from a prospective customer's automobile for the purpose of knowingly and falsely misrepresenting that they had discovered a serious transmission problem requiring extensive major repair.

"c)   They shall not falsely represent that a customer's original transmission parts are worn, defective, and the cause of a serious transmission problem, the nature of which makes it advisable that the customer purchase a rebuilt transmission or major repair."

As a result of the adverse publicity generated by these proceedings, AAMCO's operations in Minnesota were reduced to a single company-supported facility.

On December 17, 1970, a Federal Trade Commission consent order was entered which states that AAMCO and their franchisees are to cease and desist from the following practices with respect to customers of their facilities:

"a)   Misrepresenting, in any manner, the nature or extent of any service or parts necessary to properly repair an automotive component.

"b)   Misrepresenting to a customer that his transmission problem is an internal one necessitating the removal of the transmission from the automobile and its disassembly for diagnosis.

"c)   Removing and disassembling the customer's transmis-

sion for the purpose of misrepresenting that a serious transmission problem has been discovered requiring major repair service.

"d)  Failing to provide all customers, at the time of billing, with an itemized list of all parts and labor for which the customer is being charged in connection with the sale, service or repair of an automobile transmission or any other automotive component; and if any such parts were used or reconditioned, a clear disclosure on such list of the fact that such parts were used or reconditioned as the case may be.

"e)  Using any deceptive sales scheme or device to induce the sale of the products or services offered by respondents or their licensees or franchisees."

As part of their rehabilitation program, AAMCO established a manual of procedures to be followed by each of its facilities to insure compliance with the requirements placed on its business operation by the Federal government and various state governments, including Minnesota. In 1973, AAMCO entered into the franchise agreement with DeWolf to operate the AAMCO facility in Bloomington. As part of the agreement, DeWolf specifically agreed to abide by all procedures established by AAMCO and to deal fairly and honestly with his customers so as to not detract from nor bring into disrepute the trade name of AAMCO. From its inception, the DeWolf center was a profitable business enterprise. In 1974, the center reached a pinnacle of achievement within the AAMCO franchise chain when DeWolf was nominated to the president's club, an honorary group of franchisees selected because of the successful nature of their particular operation.

However, during 1975, a series of substantial complaints involving DeWolf's operation were received by the consumer division of the office of the attorney general. In response thereto, the attorney general's office contacted the director of the consumer affairs department of AAMCO's national headquarters to inform him about the alleged questionable practices at the DeWolf center. Due to the nature and number of the complaints,

AAMCO and the attorney general's office agreed to conduct a joint investigation of the center without DeWolf's knowledge.

AAMCO immediately dispatched two technical employees to Minnesota and placed them at the disposal of the attorney general's office. The investigative technique that was employed is sometimes referred to as "shopping," which consists of submitting for service vehicles in good operating order except for minor artificially induced malfunctions. To implement the investigation, a temporary garage was acquired and established in Bloomington. Three automobiles were obtained by the attorney general's office and turned over to the AAMCO technicians who completely rebuilt each transmission. The vehicles were road tested to assure proper transmission function. After the initial road test, the technicians artificially induced a minor malfunction in each automobile which could easily be corrected. Then the automobiles were tested with the malfunctions to observe the symptoms; quickly repaired; road tested again to assure proper function; the malfunctions reinduced; and the vehicles road tested for a final time to observe the symptoms.

After the vehicles had been so prepared, employees of the attorney general and AAMCO presented the vehicles at the DeWolf center, describing the characteristics of the automobile as it performed with the induced malfunctions. In each case, DeWolf and his employees failed to note the malfunctions and failed to follow AAMCO procedures for determination of defects. Rather, in direct contravention of suggested procedures, the "customer" was told that an expensive transmission repair was necessary even though the malfunction could have been corrected for a nominal cost. Shortly thereafter, work was performed on each automobile. Nevertheless, the originally induced minor malfunctions were not corrected in two of the vehicles. The parts removed from each automobile were obtained from DeWolf under a search warrant and were introduced at trial.

On August 21, 1975, as a result of these events, AAMCO served DeWolf with a notice terminating, effective immediately, the

franchise agreement between the parties. AAMCO applied for and received a temporary restraining order halting DeWolf's business operations under the trade name AAMCO. DeWolf's petition to dissolve the restraining order was denied by the district court. Upon application to this court, a writ was issued directing the trial court to dissolve the restraining order and to proceed immediately with a trial on the declaratory and injunctive relief requested by AAMCO.

Trial commenced on September 4, 1975, and the court entered an order for judgment, accompanied by findings of fact and conclusions of law, on October 20, 1975. The trial court determined, in part, that AAMCO had properly terminated DeWolf's franchise and permanently enjoined him from continuing to hold himself out to the public as an AAMCO franchisee.

On appeal, DeWolf contends:

(1)  The methods employed by the attorney general and AAMCO, through their respective employees, to gather evidence violate his rights under the so-called Minnesota privacy act.

(2)  The failure of AAMCO to give 24-hour notice to correct the alleged breaches of the franchise agreement is in violation of statutory requirements and precludes termination of the franchise.

(3)  The evidence does not sustain the termination of the franchise agreement.

■ DeWolf concedes that he never raised the issue concerning his rights under the so-called Minnesota privacy act, Minn. St. 15.162 to 15.169 before the trial court. It is a well-established principle of appellate jurisdiction that assignments of error not presented to the trial court for consideration will not be reviewed on appeal. In Skinner v. Neubauer, 246 Minn. 291, 298, 74 N. W. 2d 656, 661 (1956), this court stated:

"* * * Rule 59.01(6) of the Rules of Civil Procedure provides that a new trial may be granted because of errors of law occurring at the trial and objected to at the time or, if no objection need have been made at the trial, if the error is plainly as-

signed in the notice of motion. Since no objection was made at the trial and this error was not assigned in plaintiff's motion for a new trial, it is evident that the error now cannot be used as a basis for a new trial on appeal to this court." See, also, 2 Hetland & Adamson, Minnesota Practice, Civil Rules Ann., p. 616.

DeWolf recognizes the general rule but argues that he falls within an exception enunciated in Atwood v. Holmes, 229 Minn. 37, 41, 38 N. W. 2d 62, 65 (1949), a case which considered a failure to raise the affirmative defense of res judicata before the trial court:

"* * * As an exception to the general rule that litigants are usually bound upon appeal by the theory or theories, however erroneous or improvident, upon which the case was tried below, the appellate court has a duty to, and upon its own motion may, consider and determine a case upon the ground of illegality, although such ground was neither presented to nor considered by the trial court, if such illegality (a) is apparent upon undisputed facts, (b) is in clear contravention of the public policy, and (c) if a decision thereon will be decisive of the controversy on its merits." See, also, 1B Dunnell, Dig. (3 ed.) § 384(7).

However, since the question presented by DeWolf is evidentiary in nature and does not appear dispositive of the case on its merits, the general rule would appear applicable, barring any attempt to raise it on appeal.

Further, we note that in Gruenhagen v. Larson, 310 Minn. 454, 458, 246 N. W. 2d 565, 568 (1976), we said:

"* * * Since what is at stake for Larson in the present case is a property interest, rather than his liberty—let alone his life— the instant case is readily distinguishable from the few cases in which courts have sanctioned deviations from the basic principle that an appellate court may not consider questions raised for the first time on appeal."

In conclusion, the case at hand appears very suitable for the

■■■■■■■■■■

application of the general rule foreclosing any consideration of the applicability of the privacy act on appeal.[1]

■ Minn. St. 80C.14 provided the authority for the commissioner of securities of the Department of Commerce to adopt rules and regulations governing unfair and inequitable practices which may occur in franchise relationships. Minn. Reg. SDiv 1714 was enacted pursuant to that authority. DeWolf relies specifically on Minn. Reg. SDiv 1714 (e) to support his argument that AAMCO wrongfully terminated his franchise. Minn. Reg. SDiv 1714 reads in part:

"All franchise contracts or agreements and any other device or practice of a franchisor shall conform to the following provisions. It shall be 'unfair and inequitable' for any person to:

\* \* \* \* \*

"(e) Terminate or cancel a franchise without first having given written notice setting forth all the reasons for such termination or cancellation to the franchisee at least 60 days in advance of such termination or cancellation, except that the notice shall be effective immediately upon receipt where the alleged grounds are:

\* \* \* \* \*

"(3) Failure to cure a default under the franchise agreement which materially impairs the good will associated with the franchisor's tradename, trademark, service mark, logotype or other commercial symbol after the franchisee has received written notice to cure of at least 24 hours in advance thereof \* \* \*."

It is admitted by AAMCO, and clearly evident from the termination notice, that DeWolf was not afforded a 24-hour notice prior to termination of his franchise. Failure to comply with Minn. Reg. SDiv 1714(e)(3), argues DeWolf, amounted to an unfair franchise practice by AAMCO and therefore his franchise should be reinstated.

---

[1] Although we fail to discuss this issue, our opinion should not be construed as any indication of the merit of appellant's claim.

The trial court did not agree with this argument. As a finding of fact, the court determined:

"A twenty-four hour notice affording an opportunity to the Defendant to remedy the conduct complained of herein or to cure any damage as described in Franchise Regulation, SDiv 1714(e), promulgated pursuant to Minn. Stat. § 80C.14 and .18 dated January 13, 1975, would have been a futile and fruitless act for the Plaintiffs."

Also as a conclusion of law, the trial court held:

"The Plaintiffs are entitled to an Order immediately and permanently prohibiting the Defendant from operating under the Plaintiffs' name and trade marks. Plaintiffs have substantially complied with Franchise Regulation SDiv 1714(e) as:

"A.  A twenty-four hour notice to cure the breaches of the Franchise Agreement would have been futile under the circumstances of this case.

"B.  Defendant's only remedy for violation of SDiv 1714(e) is, as a matter of law, under the provisions of Minn. Stat. 80C.14 injunctive relief to halt the termination of the franchise agreement, which relief could in effect be granted in this action, as Plaintiffs' right to terminate the franchise agreement is at issue herein."

Thus, although recognizing the requirement of affording a franchisee 24-hour notice prior to termination of a franchise, the trial court felt, based on the facts in this case, that it would be a futile gesture. A thorough examination of the record shows that the trial court's determination of this issue is amply supported by the evidence and not clearly erroneous. Rule 52.01, Rules of Civil Procedure.

■  We find no merit in DeWolf's contention that the evidence does not sustain the trial court's determination to terminate his franchise.

Affirmed.